IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RACHEL BOHNENKAMP <br> Plaintiff <br><br> vs. <br><br> JAMES WHISTERBARTH, et al. <br> Defendants | Case No. 1:19-cv-00115-RAL <br><br> RICHARD A. LANZILLO <br> UNITED STATES MAGISTRATE JUDGE <br><br> MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM <br><br> ECF No. 47 |

I.     Introduction

Plaintiff Rachel Bohnenkamp, the spouse of an inmate housed at the Federal Correctional Institution at McKean, Pennsylvania (FCI-McKean), commenced this action against the United States of America (the Government) under the Federal Tort Claims Act (FTCA) (Count I) and against Defendant James Wusterbarth—a former Bureau of Prisons Correctional Officer—under the state common-law theories of intentional infliction of emotional distress and invasion of privacy (Counts II and III).[1] Wusterbarth's motion to dismiss the claims against him pursuant to Fed. R. Civ. Pro. 12(b)(6) is currently pending before the Court. For the following reasons, Wusterbarth's motion is DENIED.[2]

---

[1] The Government previously moved pursuant to Fed. R. Civ. P. 12(b)(1) to dismiss Mrs. Bohnenkamp's FTCA claim for lack of subject matter jurisdiction. ECF No. 39. The Court granted in part and denied in part the Government's motion. *See* ECF No. 69. The Court has subject matter jurisdiction over the surviving aspects of Mrs. Bohnenkamp's FTCA claim against the Government under 28 U.S.C. § 1346(b)(1). The Court has supplemental jurisdiction over Mrs. Bohnenkamp's state law claims against Wusterbarth pursuant to 28 U.S.C. § 1367.

[2] The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case, including the entry of final judgment, as authorized by 28 U.S.C. § 636. ECF Nos. 7, 53. Although the Complaint identified the individual defendant's last name as "Whisterbarth," he and the Government provided the correct spelling, "Wusterbarth," which the Court uses throughout this Opinion. ECF No. 20, p. 1, n. 2. The Amended Complaint refers to Plaintiff as "Mrs. Bohnenkamp." ECF No. 30. The Court will do the same.

1

II.     Factual Background

   A. Allegations of the Amended Complaint

The operative pleading before the Court is Mrs. Bohnenkamp's Amended Complaint. ECF No. 30. The following facts are derived from the Amended Complaint and accepted as true for purposes of Wusterbarth's motion to dismiss. *See US Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002). They were also previously examined in the Court's Opinion on the Government's motion to dismiss for lack of subject matter jurisdiction.

The Government hired Wusterbarth hired as a Correctional Officer at FCI McKean on November 29, 2015. ECF No. 40-2, ¶ 4. On August 18, 2018, Wusterbarth was on duty in the visitors' room at FCI-McKean when Mrs. Bohnenkamp and her two minor sons arrived to visit Mr. Bohnenkamp. ECF No. 30, ¶¶ 15-16. Mrs. Bohnenkamp had arranged for her, Mr. Bohnenkamp, and their sons to visit the "family playroom" of the visiting area. *Id.*, ¶ 18. When Mrs. Bohnenkamp arrived, Wusterbarth motioned for her to come over to the desk where he was stationed to oversee visiting room activity. *Id.*, ¶¶ 19-20. When she complied, Wusterbarth remarked to Mrs. Bohnenkamp that "he had not spoken to her much in the facility." *Id.*, ¶ 21. This comment struck Mrs. Bohnenkamp as odd because she had never met Wusterbarth before that day. *Id.*, ¶ 20.

Wusterbarth then instructed Mrs. Bohnenkamp to provide the last two digits of her telephone number, explaining that he needed to speak with her. *Id.*, ¶ 22. When Mrs. Bohnenkamp asked why, Wusterbarth replied that he could not speak freely in the facility but "hinted that there was an issue with Mrs. Bohnenkamp's husband Chris, which Defendant Wusterbarth needed to discuss with her in private." *Id.*, ¶¶ 22-23. This exchange left Mrs. Bohnenkamp "extremely troubled." *Id.*, ¶ 24. Wusterbarth then "warned her that she could not speak to anyone, including her husband, about the subject of their conversation," which "only heightened" her concern. *Id.*,

2

¶ 24. Wusterbarth again directed Mrs. Bohnenkamp to provide him with the last two digits of her telephone number so that he could contact her. *Id.*, ¶ 25. The stress and anxiety caused by Wusterbarth's orders and comments made her feel nauseous. *Id.*, ¶ 26. Mrs. Bohnenkamp ultimately provided the numbers to Wusterbarth, "believing that she had no other option and fearing that her husband was in some type of serious trouble." *Id.*

Later that day, at approximately 4:03 p.m., after Mrs. Bohnenkamp and her sons had left FCI-McKean, she received a call on her cell phone from Wusterbarth. *Id.*, ¶ 27. Wusterbarth told her that he needed to meet her to discuss her husband. *Id.*, ¶ 28. Mrs. Bohnenkamp refused to meet Wusterbarth and demanded to know what was going on. *Id.*, ¶ 29. Wusterbarth then acknowledged that his call was not about her husband; he explained that he was attracted to her and wanted to see her. *Id.*, ¶ 30. Mrs. Bohnenkamp immediately responded that his advances were inappropriate and that she was committed to her husband and children. *Id.*, ¶ 31.

Despite this rebuke, Wusterbarth insisted multiple times during the call that they meet, including at the hotel where she was staying with her two sons. *Id.*, ¶ 32. He instructed her "to leave her two children, ages seven and nine, alone in the hotel room and to meet him in the lobby." *Id.*, ¶ 33. When Mrs. Bohnenkamp refused, he instructed her to drive to Buffalo to meet him because he knew she lived near Niagara Falls. *Id.*, ¶ 34. Now, frightened that Wusterbarth knew her address, Mrs. Bohnenkamp again refused. At this, Wusterbarth then "threatened her that she could never tell anyone about his advances, and that if she did her husband would be in serious danger." *Id.*, ¶ 35.

The next day, when Mrs. Bohnenkamp returned to FCI-McKean with her sons to visit her husband, Wusterbarth was again on duty in the visitors' area. *Id.*, ¶ 36. When he saw Mrs. Bohnenkamp, Wusterbarth motioned to her to keep silent—a threat which terrified Mrs.

3

Bohnenkamp and left her in fear for her own safety and that of her husband and children. *Id.*, ¶ 37. As instructed, Mrs. Bohnenkamp did not disclose Wusterbarth's advances and threats for months. *Id.*, ¶ 38. Because Mrs. Bohnenkamp had given her personal information—including her address, email, and phone number—to the prison when she had registered to visit her husband, she feared what Wusterbarth could do with access to this information. *Id.*, ¶ 38.

On November 28, 2018, the Bohnenkamp's son received a phone call from Wusterbarth who identified himself as an officer at the Bureau of Prisons and told him that his father "had recently been in an altercation at the prison, and had died." *Id.*, ¶¶ 39-40. When Mrs. Bohnenkamp's son related this information to her, she was terrified and contacted the prison. *Id.*, ¶ 41. A prison official advised that her husband was alive and had not been involved in any incident. *Id.*

On March 2, 2019, while Mrs. Bohnenkamp visited her husband at FCI-McKean, another corrections officer informed them that a new officer would be supervising the visitors' room for the next quarter. *Id.*, ¶ 42. When Mrs. Bohnenkamp asked whether Wusterbarth would be supervising visitation, the same corrections officer advised her that Wusterbarth was on voluntary leave pending an investigation of sexual harassment and misconduct against visitors. *Id.*, ¶¶ 43-44. That same day, Mrs. Bohnenkamp filed a report regarding Wusterbarth's misconduct with the Bradford, Pennsylvania Police Department. As part of her report, she told the police that Wusterbarth had contacted her using a cell phone with a Las Vegas area code. *Id.*, ¶ 47. Later that evening, at 9:17 p.m., Mrs. Bohnenkamp received a series of text messages from a number she did not know, which read as follows: "You opened your mouth, you aren't smart at all"; "2022 you seem comfortable at best"; "My Vegas number? Seriously"; "See ya soon." *Id.*, ¶¶ 48-49. Mrs. Bohnenkamp understood the reference to '2022" to be to Mr. Bohnenkamp's prison release date, while "My Vegas number?"

4

referred to the fact that Mrs. Bohnenkamp had provided Wusterbarth's Las Vegas area cell phone number to the Bradford Police. *Id.*, ¶ 51. Mrs. Bohnenkamp feared that these text messages meant that Wusterbarth would harm her or her family in retaliation for her police report. *Id.*, ¶¶ 52-53. To avoid Wusterbarth, Mrs. Bohnenkamp changed her phone number and moved her family multiple times. *Id.*, ¶ 53.

Mrs. Bohnenkamp's husband also received a "bizarre" postcard while he was incarcerated which was sent by Wusterbarth but purported to be from his son. *Id.*, ¶¶ 54–56. It was signed with his son's nickname and included comments about the possibility of the Bohnenkamps' divorce. *Id.* This was sent after Mrs. Bohnenkamp had rejected Wusterbarth's advances. *Id.*, ¶ 56.

When Mrs. Bohnenkamp reported Wusterbarth's conduct to officials at FCI McKean, she was informed that they "already knew about Defendant Wusterbarth's predatory conduct, and had known for some time." *Id.*, ¶¶ 57-58. Mrs. Bohnenkamp also alleges that prison officials, including Warden Trate, had known that Wusterbarth kept an office calendar on which he recorded when various women were scheduled to come to the visitors' area at FCI-McKean, that Wusterbarth used this calendar to ensure that he was present when the women he wanted to pursue came to the prison, and that Warden Trate was aware of Wusterbarth's calendar before his contact with Mrs. Bohnenkamp on August 18, 2018. *Id.*, ¶¶ 58-61.

Because of Wusterbarth's harassment, "Mrs. Bohnenkamp has suffered fear, humiliation, panic, anxiety and helplessness." *Id.*, ¶ 82. She has also "lived in a constant state of concern that her husband might be retaliated against for her refusal to cooperate with Defendant Wusterbarth's desires," until her husband was recently released. *Id.*, ¶ 84.

Mrs. Bohnenkamp filed an administrative claim alleging Wusterbarth subjected her to the preceding mistreatment and that Warden Trate was aware of Wusterbarth's predatory conduct. *Id.*,

¶ 68. *See also* ECF No. 40-3. Her administrative claim was denied on June 15, 2020. ECF No. 30, ¶ 69.

### B. Mrs. Bohnenkamp's Legal Claims Against Wusterbarth

The Amended Complaint asserts an intentional infliction of emotional distress claim (Count II) and an invasion of privacy claim (Count III) against Wusterbarth. ECF No. 30. Under Count II, Mrs. Bohnenkamp claims that Wusterbarth used his authority as a corrections officer to subject her to repeated acts of sexual harassment and, after she refused his advances, repeated acts of retaliation, all of which caused her to suffer severe emotional distress. *Id.*, ¶ 89. Count III asserts that Wusterbarth invaded her privacy "by stalking her while she visited her husband at FCI-McKean, obtaining her personal information from the FCI-McKean records, attempting to use his official role to coerce her to provide sexual favors to him, contacting her and her family members for the purpose of intimidating her after she rebuffed him, and threatening her after she filed a police report against him." *Id.*, ¶ 101-02. Wusterbarth's motion challenges the legal sufficiency of the Amended Complaint's allegations to sustain either of Mrs. Bohnenkamp's claims against him.

### C. Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff is likely to prevail on the merits; rather, the plaintiff must only present factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004)). *See also Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). A complaint should only be dismissed pursuant to Rule 12 (b)(6) if it fails to allege "enough facts to

state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S. Ct. 1955 (rejecting the traditional Rule 12 (b)(6) standard established in *Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)). In making this determination, the court must accept as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).

While a complaint does not need detailed factual allegations to survive a motion to dismiss, a complaint must provide more than labels and conclusions. *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955. A "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)). Moreover, a court need not accept inferences drawn by a plaintiff if they are unsupported by the facts as set forth in the complaint. *See California Pub. Employee Ret. Sys. v. The Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004) (citing *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)). Nor must the Court accept legal conclusions disguised as factual allegations. *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955. *See also McTernan v. City of York, Pennsylvania*, 577 F.3d 521, 531 (3d Cir. 2009) ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Expounding on the *Twombly/Iqbal* line of cases, the Third Circuit has articulated the following three-step approach:

> First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.'

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)). This determination is "a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 129 S. Ct. 1937.

### D. Analysis

1. Mrs. Bohnenkamp's Amended Complaint alleges facts sufficient to satisfy the "extreme and outrageous" conduct element of her IIED claim.

Although the Pennsylvania Supreme Court has never explicitly recognized the tort of intentional infliction of emotional distress (IIED) under Pennsylvania law, it has cited Section 46 of the Restatement (Second) of Torts "as setting forth the minimum elements necessary to sustain such a cause of action." *Taylor v. Albert Einstein Med. Ctr.*, 562 Pa. 176, 754 A.2d 650, 652 (Pa. 2000) (citations omitted). Based on this precedent, the United States Court of Appeals for the Third Circuit has predicted that the Pennsylvania Supreme Court would adopt IIED as a cause of action as set forth in Section 46. *Williams v. Guzzardi*, 875 F.2d 46, 50–51 (3d Cir. 1989) (discussing *Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265, 1273 (3d Cir. 1979) (en banc)). Applying Section 46, the Third Circuit identified the following elements a plaintiff must demonstrate to prevail on an IIED claim: (1) the Defendant's conduct was extreme and outrageous; (2) his conduct caused the plaintiff severe emotional distress; and (3) he acted intending to cause that person such distress or with knowledge that such distress was substantially certain to occur. *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 217-18 (3d Cir. 2001) (citing Restatement (Second) of Torts § 46 (1965)). *See also Robinson v. Nat'l Railroad Passenger Corp.*, 821 Fed. Appx. 97, 102 (3d Cir 2020). Several Pennsylvania courts and federal courts interpreting Pennsylvania law have held that a plaintiff must also allege physical injury or harm to state an IIED claim. *See, e.g., Selig v. Sloyer*, 2014 WL 3907131, at *3 (Pa. Commw. Ct. Aug. 12, 2014) (citing *Abadie v. Riddle Memorial Hospital*, 404 Pa. Super. 8, 589 A.2d 1143 (Pa. Super. Ct. 1991)); *Doughty v. Wells Fargo Bank, N.A.*, 2018 WL 1784159, at *4 (E.D. Pa. Apr. 13, 2018).

Wusterbarth's motion to dismiss Mrs. Bohnenkamp's IIED claim challenges *only* the sufficiency of her factual allegations to support the "extreme and outrageous" conduct element of the cause of action. ECF No. 47, pp. 7–9. Wusterbarth correctly notes that a plaintiff must clear a high factual bar to support this element. Indeed, liability on an IIED claim "has been found only where the [defendant's] conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Field v. Phila. Elec. Co.*, 388 Pa. Super. 400, 565 A.2d 1170, 1184 (Pa. Super. Ct. 1989). "It is the court's responsibility to determine if the conduct alleged in a cause of action reaches the requisite level of outrageousness." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1487 (3d Cir. 1990).

The Court finds that Wusterbarth's alleged misconduct in this case easily rises to the requisite level of outrageousness necessary to support a plausible IIED claim against him. The Amended Complaint alleges facts to support a finding that Wusterbarth used his position of authority to solicit a sexual relationship with Mrs. Bohnenkamp under the pretext that he possessed important and sensitive information regarding her incarcerated husband. *Id.*, ¶ 35. According to the Amended Complaint, when she rejected him, he warned her that "she could never tell anyone about his advances, and that if she did her husband would be in serious danger." *Id.* The Amended Complaint alleges that Wusterbarth further escalated his harassment and retaliation to the point of misrepresenting to Mrs. Bohnenkamp's son that her husband had died in prison when Wusterbarth knew that her son would communicate this false information to Mrs. Bohnenkamp. *Id.*, ¶¶ 39–41. The Amended Complaint also alleges that Wusterbarth sent her text messages that could reasonably be understood as threats against her safety and that of her family. *Id.*, ¶¶ 47–53.

9

Several courts have found that falsely representing that a spouse or other family member has died or suffered a serious injury is enough on its own to demonstrate extreme and outrageous conduct. Indeed, Comment d to Section 46 of the Restatement of Torts cites cases involving precisely this type of conduct as sufficiently outrageous to support an IIED claim. Both the Pennsylvania Supreme Court and federal courts interpreting Pennsylvania law have looked to the comments to Section 46 and the cases cited therein to guide their analysis of whether conduct is outrageous for purposes of an IIED claim. *See Kazatsky v. King David Mem'l Park, Inc.*, 515 Pa. 183, 527 A.2d 988, 991-92 (Pa. 1987); *Doughty v. Wells Fargo Bank, N.A.*, 2018 WL 1784159, at *3 n. 4 (E.D. Pa. Apr. 13, 2018) (noting that "the black letter rule of § 46 of the Restatement, along with the interpretive comments, may be applied as the basis in Pennsylvania law for [IIED]") (quoting *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1274 (3d Cir. 1979)).

One illustrative case cited by the Reporter's Notes to Comment d is *Savage v. Boies*, wherein the court found a police officer liable for IIED based on his falsely telling the plaintiff that her child was seriously injured as a means to induce her to enter a mental hospital. 77 Ariz. 355, 272 P.2d 34 (1954). The Reporter's Notes also cite *Bielitski v. Obadisk*, a case out of Canada that imposed liability based on the defendant's spreading a false rumor that the plaintiff's son had hanged himself when the defendant knew that the rumor was likely to reach the plaintiff. (1921) 61 D.L.R. 494, 495, 497, 15 Sask. L.R. 155 (Can. Sask. K.B.). *See also, Wilkinson v. Downston*, 2 Q.B.D. 57 (1897) (liability based on the defendant's having falsely told the plaintiff that her husband had been severely injured in an accident; first example cited to illustrate extreme and outrageous conducted under Section 46 of the Restatement). Here, Wusterbarth's alleged misconduct is directly analogous to that addressed in the cases cited in the comments to Section 46. In fact, the Amended Complaint presents a narrative even more compelling than those cases because it goes beyond the one shocking misrepresentation

10

that Mr. Bohnenkamp had died and presents this misrepresentation as part of a pattern of harassment and retaliation.

Wusterbarth repeatedly characterizes his actions merely as "bad romantic passes that" Mrs. Bohnenkamp "subjectively view[s] as offensive." ECF No. 47, p. 8. It is accurate that Mrs. Bohnenkamp's allegations include Wusterbarth's unwanted sexual advances. See ECF No. 30, ¶¶ 37, 82-85. And the Court agrees that propositioning another person to engage in a physical or romantic relationship alone may not enough to support an IIED claim. But here, Wusterbarth's failed overtures were allegedly accompanied by cruel misrepresentations and threats to her safety and that of her family that one would reasonably expect to cause a person of average sensitivity to suffer severe emotional distress.

Wusterbarth also argues in his brief that Mrs. Bohnenkamp's IIED claim must be dismissed because the "facts presented by the Plaintiff are speculatively tied to the Defendant" and "cannot be connected" to him. ECF No. 48, pp. 8-9. This argument ignores the applicable standard of review on a motion to dismiss. The current posture of this case requires the Court to take as true all well-pled factual allegations in the complaint and view them in a light most favorable to the plaintiff. *See U.S. Express Lines Ltd.*, 281 F.3d at 388. Under this standard, Wusterbarth's motion to dismiss this IIED claim must be denied.

      2. The Amended Complaint alleges facts to state a plausible claim for invasion of privacy.

The tort of invasion of privacy in its intrusion on seclusion form requires "an intentional intrusion upon the seclusion of [plaintiff's] private concerns which was substantial and highly offensive to a reasonable person, and …sufficient facts to establish that the information disclosed would have caused mental suffering, shame or humiliation to a person of ordinary sensibilities."

*Boring v. Google Inc.*, 362 Fed. Appx. 273, 279 (3d Cir.2010) (quoting *Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co.*, 570 Pa. 242, 809 A.2d 243, 247 (Pa. 2002)). The privacy invasion may occur "(1) by physical intrusion into a place where the plaintiff has secluded himself, (2) by use of the defendant's senses to oversee or overhear the plaintiff's private affairs, or (3) some other form of investigation or examination into plaintiff's private concerns." *Harris by Harris v. Easton Publishing Co.*, 483 A.2d 1377, 1383-84 (Pa. Super. Ct. 1984). Further, unlike libel and slander claims, publicity is not an element of the claim of intrusion on seclusion invasion of privacy. *Id.* Examination of the caselaw and the Restatement (Second) of Torts, Section 652B (which Pennsylvania has adopted) reveals that even if the alleged invasion did occur in some way upon the plaintiff's private concerns, the mere fact of the intrusion is insufficient; the conduct must have been "highly offensive to a reasonable person." *Larsen v. Philadelphia Newspapers, Inc.*, 375 Pa. Super. 66, 543 A.2d 1181, 1186–87 (Pa. Super. Ct. 1988)). *See also Marks v. Bell Telephone Co. of Pa.*, 460 Pa. 73, 331 A.2d 424 (Pa. 1975). Moreover, although persistent intrusions are illustrative of the cause of action in the Second Restatement, "it is clear that the important point is not that the intrusions be persistent but that the intrusions should by one means or another…rise to the level of what a reasonable person would find '"highly offensive."' *Diaz v. D.L. Recovery Corp.*, 486 F. Supp. 2d 474, 480 (E.D. Pa. 2007), *cited approvingly by Boring*, 362 Fed. Appx. at 279 (3d Cir. 2010).

Wusterbarth argues that Mrs. Bohnenkamp has failed to plead facts to support a plausible claim for invasion of privacy. ECF No. 47, p. 3. In support of the sufficiency of her claim, Mrs. Bohnenkamp cites *Wolfson v. Lewis*, 924 F. Supp. 1413 (E.D. Pa. 1996). In that case, the district court granted a preliminary injunction in favor of the plaintiffs on their intrusion on seclusion claim that the defendants—news reporters—had engaged in "a course of hounding, harassing, intimidating, and frightening conduct" in violation of the plaintiff's "right to be let alone' to enjoy the tranquility and solitude of their home" when the reporters over a period of days surveilled the

plaintiffs at their home, closely followed them in vehicles from their home to their daughter's daycare and back, and aimed professional, technically sophisticated video and sound recording equipment at them in public and at their home. *Id.*, at 1423–34. Mrs. Bohnenkamp argues that the facts alleged in the Amended Complaint are more egregious than those found sufficient for a preliminary injunction in *Wolfson*. ECF No. 49, pp. 7-8. Wusterbarth argues that *Wolfson* is distinguishable on its facts because the Amended Complaint does not allege that he followed Mrs. Bohnenkamp to her home or anywhere else. ECF No. 55, p. 4. In the Court's view, this case presents factual allegations sufficiently analogous to the facts examined in *Wolfson* to support Mrs. Bohnenkamp's claim. No two cases arise from identical facts, and in certain respects, the Amended Complaint here alleges more egregious conduct than that considered in *Wolfson*. For example, the reporter defendants in that case made no explicit or implied threats of harm or violence.

In addition, contrary to Wusterbarth's position, there is no requirement in Pennsylvania case law that the only actionable intrusions on seclusion occur at home, school, or work. *See, e.g., Wolfson*, 924 F. Supp. at 1420 (acts "conducted in a public or semi-public place, may nevertheless rise to the level of invasion of privacy based on intrusion upon seclusion."). Mrs. Bohnenkamp alleges that Wusterbarth invaded her privacy when he called her and sent her text messages that were highly offensive and caused her harm. The court in *Diaz* found that the plaintiff stated a cause of action for intrusion on seclusion based on statements in a single phone call. 486 F. Supp. 2d at 479 (E.D. Pa. 2007). The plaintiff received a call from a then-unknown person who "warned her that he would, within hours, 'repossess all of her household belongings and even her car'" unless she paid up on "a Summons for over $100,000." *Id.*, at 476. The caller also stated, "if you don't want your baby to sleep on the floor tonight you'll give me your checking account number"; and "aren't you ashamed that the father of your child doesn't care about you or your child, Henry has five other girlfriends that we also have summons for, aren't you afraid of getting AIDS?" *Id.* The court ruled

13

that these statements supported a claim for invasion of privacy "by virtue of the outrageous character of the one intrusion described by Plaintiffs." *Id.*, at 480. By comparison, courts reject intrusion on seclusion claims when the facts alleged do not "clearly demonstrate outrageous, rather than annoying or upsetting, conduct." *Rush v. Portfolio Recovery Associate LLC*, 977 F. Supp.2d 414, 435 (D.N.J. Oct. 17, 2013). *See Correctional Medical Car, Inc. v. Gray*, 2008 WL 248977, at *7 (E.D. Pa. Jan. 30, 2008) (single call which involved no harassment or threats was not highly offensive as a matter of law in comparison to the Eastern District of Pennsylvania's decision in *Diaz*); *Linko v. Nat'l Action Financial Services*, 2007 WL 6882431, at *1, *8 (M.D. Pa. Oct. 29, 2007) (insults and swears accompanying three phone calls requesting payment on a debt were not highly offensive); *Wattie-Bey v. Modern Recovery Solutions*, 2016 WL 1253489, at *7 (M.D. Pa. Mar. 10, 2016) (granting summary judgment on evidence of two calls to a cell phone placed within a minute by an automated phone dialer).

Wusterbarth is alleged to have intruded on Mrs. Bohnenkamp's privacy by attempting to coerce her into a sexual relationship with false and misleading expressions of concern for her husband, deceptive and improper efforts to secure her personal identifying information, and a false report that her husband had died. The Amended Complaint further alleges that Wusterbarth made implicit threats against her and her family and, after she reported his misconduct to authorities, sent threatening and intimidating text messages to her. As previously discussed, such conduct would be highly offensive to a reasonable person. *See Savage*, 77 Ariz. 355; *Bielitski*, 61 D.L.R. at 495, 497. These allegations are sufficiently analogous to the harassment in *Diaz* to state a claim for intrusion on seclusion. *Diaz*, 486 F. Supp. 2d at 479. Wusterbarth argues that it is "pure speculation" unsupported with documentation that he placed the phone call or sent these text messages at issue [ECF No. 47, pp. 5-6], again raising factual disputes that are beyond the Court's applicable standard of review on a motion to dismiss. *See Burtch*, 662 F.3d at 221 (citations omitted). Accepting the facts

14

alleged in the Amended Complaint as true and drawing all reasonable inferences in the plaintiff's favor, as the Court must, Mrs. Bohnenkamp's Amended Complaint states an invasion of privacy claim. Accordingly, the Court will deny Wusterbarth's motion to dismiss this claim.

V.      Conclusion

The Amended Complaint alleges facts sufficient to state plausible claims of both intentional infliction of emotional distress and invasion of privacy against Wusterbarth. Therefore, the Court deny Wusterbarth's motion to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(6). An appropriate order follows.

## ORDER

Defendant James Wusterbarth's Motion to Dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) [ECF No. 47] is DENIED. Wusterbarth is ordered to file an Answer to the Amended Complaint on or before May 28, 2021.

Dated: May 14, 2021

RICHARD A. LANZILLO
United States Magistrate Judge